**BANK OF NEW YORK v.
UNITED STATES.**

United States District Court
S. D. New York.
June 29, 1953.

**376**

Nevius, Brett & Kellogg, New York City, for plaintiff (Emil V. Pilz, New York City, of counsel).

J. Edward Lumbard, U. S. Atty. for Southern District of New York, New York City, for defendant (James A. Devlin, Asst. U. S. Atty., New York City, of counsel).

LEIBELL, District Judge.

This is a suit for a refund of part of the estate tax paid by the executors of Eugene Kruskal, who died July 10, 1944. He left a last will and testament, dated February 25, 1943, which was admitted to probate in the Court of Probate for the District of Roxbury, Connecticut, on August 2, 1944, and letters testamentary were issued to his executors on the same day. The suit is now prosecuted by the Bank of New York, as successor executor of the estate.

It appears that the decedent married Lilly Rexhouse, after he secured a Nevada divorce from his first wife, Helen Hall, on April 6, 1940. Both survived him. His second wife and decedent's daughter, Elizabeth Kruskal Allen, were named as the beneficiaries of a trust of the principal of the residuary estate. Decedent's former wife, Helen d'Aubart Hall, received a bequest of cash under the will. The provisions of the will are mentioned as part of the background in this case. They are not involved in this suit for a refund of part of the estate tax.

The executors filed a federal estate tax return in which they advised the Commissioner that in addition to the estate property that they were reporting as subject to a tax (of $167,486.36) the deceased left seven life insurance policies,[1]

1. (1) Policy of insurance of New York Life Insurance Company,
No. 10,019,392     $ 50,000.00
(2) Policy of insurance of New England Mutual Life Insurance
Company No. 258,155     10,000.00
(3) Policy of insurance of Massachusetts Mutual Life Insurance
Company No. 436,776     10,000.00
(4) Policy of insurance of Massachusetts Mutual Life Insurance
Company No. 436,777     10,000.00
(5) Policy of insurance of Northwestern Mutual Life Insurance
Company No. 825,070     2,000.00
(6) Policy of insurance of Northwestern Mutual Life Insurance
Company No. 912,599     5,000.00
(7) Policy of insurance of Northwestern Mutual Life Insurance
Company No. 1,507,013     13,000.00

of a face amount of $100,000 which they claimed were not subject to an estate tax on the ground that they were not part of decedent's gross estate. The policies were to provide annual payments to Helen Hall after decedent's death, pursuant to the terms of a separation agreement which was approved, adopted and confirmed by a divorce decree of a Nevada court. Upon an audit of the estate tax return, the Agent included in decedent's gross estate $100,414.57, as the value of the policies on decedent's death. A deficiency assessment of $30,751.35, plus $2,530.88 interest was made by the Commission on October 8, 1946. The executors paid the assessment under protest on February 24, 1947, and on August 15, 1947, filed a claim for a refund of the amount paid, which the Commissioner rejected on February 9, 1948. The executors on March 30, 1949, brought this suit to recover the $33,382.23 plus interest from February 24, 1947.

█ The separation agreement, the decree of divorce, and certain provisions of the policies of life insurance are the important documents to be considered in determining whether the value of the policies on the decedent's death should be included in his gross estate subject to a federal estate tax. This case has been submitted mainly on an agreed statement of facts to which the above documents are annexed. The Government presented one witness who testified that the decedent's reversionary interest in the life insurance policies was in excess of 5%. The plaintiff claims that this question has no bearing on the ultimate decision of this case, because the statute provides that "For the purposes of clause (B) of this paragraph, the term 'incident of ownership' does not include a reversionary interest." § 811(g) (2) of the Internal Revenue Code, 26 U.S.C.A. § 811(g) (2). But that provision was later amended [1a] and the amendment was made retroactive with respect to estates of decedents dying after October 21,

1942 and provided that the term "incident of ownership" shall include "a reversionary interest only if (1) at some time after January 10th, 1941, the value of such reversionary interest exceeded 5 per centum of the value of the policy, and (2) the reversionary interest arose by the express terms of the policy or other instrument and not by operation of law." The amendment also provided that "As used in this subsection, the term 'reversionary interest' includes the possibility that the policy, or the proceeds of the policy, (A) may return to the decedent or his estate, or (B) may be subject to a power of disposition by him." The testimony of the Government's witness was therefore relevant and the correctness of the schedules he prepared is not challenged.

### Provisions of the Separation Agreement.

The separation agreement entered into by Helen Hall Kruskal and Eugene Kruskal, her husband, on September 26, 1939, contained certain recitals: that the parties were married June 1, 1915; that they had one daughter, who in 1939 was over 21 years of age and married; that the parties to the agreement were living separate and apart; that Mrs. Kruskal had brought suit in the State of Connecticut for a divorce; and that both parties desired "to adjust all questions of property and support in lieu of obtaining a judicial settlement thereof".

Under paragraph First of the agreement Mrs. Kruskal was given "a choice of any or all of the household furnishings, furniture, ornaments etc. in the house at New Milford (Connecticut) and the apartment" theretofore "occupied by the parties" thereto "in the City of New York".

Paragraph Second provided that "in part consideration of the payment in paragraph 'Fourth (a)' [$17,500]" Mrs. Kruskal agreed "to convey to Mr. Kruskal or his designee all her right, title and

---

[1a]. See Chapter 994, Title V, Estate Tax, Sec. 503(a), September 23, 1950, constituting an amendment of Sec. 404(c) of the Revenue Act of 1942, 26 U.S.C. A. § 811 note.

interest in and to the house and lands at New Milford * * * the value of her interest being fixed and agreed upon as * * * $7500".

By paragraph Third Mrs. Kruskal agreed that she had incurred no debts and would not incur any debts, for which her husband would be liable.

Paragraph Fourth is quoted in full as follows:

"Fourth: For the support and maintenance of Mrs. Kruskal, Mr. Kruskal agrees to pay and Mrs. Kruskal agrees to accept the following amounts and payments:

"(a) Upon the signing of this agreement Seventeen thousand five hundred Dollars ($17,500) in cash;

"(b) So long as Mr. Kruskal shall be engaged in active business, meaning thereby that he receives compensation for the services rendered by him to the business, the sum of Eight thousand Dollars ($8,000) per annum in equal monthly installments commencing October 1st, 1939. In the event that Mr. Kruskal shall cease to be actively engaged in business, the amount to be paid by Mr. Kruskal during his lifetime to Mrs. Kruskal shall be subject, at the request of Mr. Kruskal, to arbitration, in which arbitration he shall appoint one arbitrator, Mrs. Kruskal one arbitrator and the two arbitrators so selected shall choose a third. The arbitrators shall not, however, in any event, increase the payment to Mrs. Kruskal beyond Eight thousand dollars ($8,000) per annum. The payments provided in this paragraph, either of $8,000 per annum, or in the event of arbitration, of such amount as shall be determined by the arbitrators, shall be paid during the time both Mr. Kruskal and Mrs. Kruskal shall be alive and shall cease upon the death of either.

"(c) To provide for the support and maintenance of Mrs. Kruskal in the event that Mr. Kruskal shall predecease her, Mr. Kruskal agrees to maintain insurance on his life which he now holds, in the amount of One Hundred Thousand Dollars ($100,000) and, upon his death, his estate is to be discharged from any obligation for further payments as set forth in subdivision (b) hereof.

"The purpose of this insurance is, however, to secure annual payments during the balance of the life of Mrs. Kruskal to her for her support and she hereby agrees not to assign her interest therein except as in subdivision (d) provided, and to take under the provisions of said policies the payment of said insurance in installments annually during the balance of her life under any one of the optional plans assuring payments for the balance of the beneficiary's life and that in the event that she shall elect a plan whereby a 'certain' amount shall be payable irrespective of when she died, that she will designate as the beneficiary for the balance of such 'certain' payments, her daughter, Elizabeth Kruskal Allen.

"The designation of Mrs. Kruskal as beneficiary under said policies, shall be irrevocable, and Mr. Kruskal agrees to execute the necessary instruments to make such irrevocable designation, except the right to assign to Mr. Kruskal as provided in subdivision (c) of this paragraph.

"(d) In the event that Mr. Kruskal shall procure for the benefit of Mrs. Kruskal a life annuity in the amount of Eight thousand Dollars ($8,000) per annum in any insurance company satisfactory to Mrs. Kruskal, Mrs. Kruskal agrees to assign to him all her right, title and interest in the insurance carried for her benefit under subdivision (c) of this paragraph."

It should be noted here that Mr. Kruskal did not procure any life annuity for Mrs. Kruskal under the sub-paragraph (d), last quoted.

Paragraph Fifth contained provisions which in effect constituted mutual general releases "saving and excepting the obligations arising out of this agreement".

Under paragraph Sixth Mr. Kruskal agreed to defend and indemnify Mrs. Kruskal from all actions, claims and demands contracted or to be contracted by him "without prejudice, however, to his right to enforce the covenants, obligations and liabilities of Mrs. Kruskal under the provisions of this agreement".

Paragraph Seventh contained similar covenants by Mrs. Kruskal.

Paragraph Eighth is quoted in full as follows:

"Eighth: Mrs. Kruskal hereby releases her right of dower in any land or real estate of which Mr. Kruskal may now or hereafter be seized or possessed and that she will execute, acknowledge and deliver, at the request of Mr. Kruskal, or his legal representatives, without cost or expense to her, all such deeds, releases or other instruments that may be necessary to release or extinguish such right of dower. Mrs. Kruskal hereby releases all her right to or interest in the separate estate of Mr. Kruskal after his death and Mr. Kruskal hereby releases all his interest in or his right or claim to the separate estate of Mrs. Kruskal after her death."

By paragraphs Ninth and Tenth the parties agreed to live separately and apart, and that neither would disturb or interfere with the other, or with the right of each to carry on such business severally as he or she might decide to engage in.

The last two parts of paragraph Eleventh provide:

"By and with the advice of counsel, Mrs. Kruskal accepts the provisions herein contained with respect to the support and maintenance of herself, in full satisfaction of any right which she has or may have for support and maintenance for herself by Mr. Kruskal or for any pecuniary assistance from him whatsoever.

"By and with the advice of counsel, Mrs. Kruskal accepts the property apportioned to her as hereinbefore and hereinafter referred to, in lieu of any rights, title, interest, property, claim and demand whatsoever (except arising out of this agreement) in law or in equity which she ever had, now has or at any time hereafter may have against Mr. Kruskal or his heirs, executors, administrators or any of them, whether by dower, distribution, administration or otherwise howsoever; and in consideration of the said provisions, and agreements hereof, each of the parties does by these presents, grant, remise, release and forever quitclaim unto the other, each of their heirs, executors, administrators and assigns, forever, all the dower, courtesy and thirds, right and title of dower and thirds, and all other rights, title, interest, property, claim and demand whatsoever, in law or in equity, which either of them ever had, now has, or may hereafter have to any and all property and any and all interest in property of the other, which either of them ever had, now has or may hereafter acquire; so that each of the parties, their heirs, executors, administrators and assigns, or any other person or persons for any of them, shall not have, claim, challenge or demand any dower, courtesy or thirds, or any rights, claim or demand whatsoever of, in or to any and all of said property or interest in property of the other, in whatsoever hand, seizin or possession the same may or can be and thereof and therefrom shall be utterly barred and excluded forever."

Paragraph Twelfth provided that each would execute and deliver such further instruments as might be necessary to carry out the purposes of the agreement, and paragraph Thirteenth seems to be a repetition of paragraph Twelfth.

Paragraph Fourteenth of the agreement is quoted in full as follows:

"Fourteenth: Nothing in this agreement contained shall be construed to hinder either party from seeking a decree in a matrimonial action brought in good faith pursuant to due process of law in a court of competent jurisdiction because of any past or future fault of the other and each party consents that the decree which may be entered in any such case shall conform to this agreement, and to that end shall contain such terms as the party in whose favor any provision herein is made may reasonably and lawfully demand.

"In the event that any such action shall be instituted by either of the parties hereto, the other shall enter his or her appearance in such suit. This clause shall not be construed as an agreement not to contest such matrimonial action.

"The parties hereto further agree that in the event of any temporary or final judgment, order or decree that may or shall be rendered in any action or proceeding between the parties hereto, such order, judgment or decree shall contain no other provisions than herein set forth regarding alimony, maintenance and support for Mrs. Kruskal, and Mrs. Kruskal does hereby renounce and waive any right that she may have except under the terms of this agreement; it being further agreed that the terms of this agreement shall be fully binding and in full force and effect upon the claim or demand that each may rightfully have against the other.

"In case of any matrimonial litigation, Mrs. Kruskal shall not apply for, demand or receive any temporary alimony, costs and any counsel fees, in excess of One Thousand Dollars ($1,000) and any petition for alimony shall be in accordance with this paragraph and this agreement."

Paragraph Fifteenth provided that the agreement could not be modified except in writing and that no waiver of any breach should be deemed a waiver of any subsequent breach of the same or different nature. Paragraph Sixteenth stated that the agreement contained the entire understanding of the parties.

Paragraph Seventeenth provided that the agreement should be binding upon the heirs, executors and personal representatives and assignees of the parties, and further stated:

"However, it is expressly understood and agreed between the parties hereto that no payments are to be made under the terms of this agreement after the death of Mr. Kruskal, except such arrears as may have accumulated during his lifetime, and except for the life insurance policies hereinbefore mentioned."

The Life Insurance Policies.

In the fall of 1940 the decedent, Eugene Kruskal, endorsed all seven policies so as to conform the provisions thereof to the requirements of the separation agreement, and designated Helen Hall Kruskal as primary beneficiary. Decedent also designated Elizabeth Kruskal Allen, his daughter, as contingent beneficiary.

The endorsement, dated September 25, 1940, on the *New England Mutual Life Insurance Company* policy No. 258,155 provided that if at any time there was no living payee entitled to any payment, any guaranteed amount still unpaid should be paid to the executors or administrators of the insured. In addition, the endorsement prohibited the insured from changing the beneficiary during the lifetime of the primary beneficiary without her consent, or if she predeceased him, from changing the contingent beneficiary, Elizabeth K. Allen, without the latter's consent.

The endorsement, dated September 25, 1940, on the *New York Life Insurance Company* policy No. 10,019,392 provided that if the beneficiaries of the policy

should predecease the insured, the proceeds were thereupon payable to the insured's "Executors, Administrators or Assigns * * * ". In addition the endorsement prohibited the insured from changing the beneficiary without the consent of Mrs. Kruskal, and if she predeceased him, without the consent of his daughter, the contingent beneficiary. However, if the insured were predeceased by both the beneficiaries under the policy he then had the right to change the beneficiary without the consent of anyone.

The endorsement on the *Massachusetts Mutual Life Insurance Company* policies Nos. 436,776 and 436,777, and dated September 25, 1940, stated in part as follows:

"Upon the death of the last survivor of myself, my said wife and my said daughter, any funds then retained by the Company shall be paid in one sum to the executors or administrators of such last survivor. * * *

"Under each of said policies I hereby restrict my right to change and successively change to any beneficiary so that while my wife, the said Helen H. Kruskal, is living and named as a beneficiary under the policy, I shall have the right to change only with her consent."

The endorsement however did not prevent the insured from changing the contingent beneficiary if the primary beneficiary predeceased him.

The endorsement, dated August 31, 1940, on *Northwestern Mutual Life Insurance Company* policies Nos. 825,070, 912,599 and 1,507,013, contained a waiver of the insured's right to change the designation of his wife, as direct beneficiary thereunder, but he did not waive his right to change the contingent beneficiary. The face of the policy provided that if no beneficiary survived the deceased, any proceeds due were to be paid to the executors, administrators or assigns of the insured unless he directed otherwise.

Eugene Kruskal died on July 10, 1944. At that time his divorced wife, Helen Hall, was living and was about 57½ years old. She was born December 12, 1886. Her daughter, Elizabeth Kruskal Allen, was about 26 years old, having been born July 16, 1918. Helen Hall's life expectancy at the time of Eugene Kruskal's death was 15.39 years.

The amounts Helen Hall has received monthly on each policy since the death of Eugene Kruskal are as follows:

Under New York Life Insurance Company policy No. 10,019,392, in face amount of $50,000, Mrs. Kruskal receives $325.84 in monthly installments and will continue to receive said monthly installments for the rest of her life. Upon her death nothing is payable to her daughter.

Under the New England Mutual Life Insurance Company policy No. 258,155, in the face amount of $10,000, value of proceeds $10,033.75, Mrs. Kruskal is guaranteed $57.79 in monthly installments plus surplus interest for life. Any amount that may be due from the proceeds on the death of Mrs. Kruskal will be paid in a lump sum to her daughter.

Under the Massachusetts Mutual Life Insurance Company policies Nos. 436,776 and 436,777, each in the face amount of $10,000, Mrs. Kruskal receives a total of $121.20 monthly until July 10, 1954. If she lives beyond that date the payments continue till her death. Should she die prior to the above date the installments are payable as they become due to her daughter until July 10, 1954.

Under the Northwestern Mutual Life Insurance Company policies Nos. 825,-070, 1,507,013 and 912,599 in face amounts of $2,000, $13,000 and $5,000 respectively, Mrs. Kruskal receives $119.40 (which may be increased during the stipulated term by dividends apportioned) until July 10, 1954, and for life thereafter. Should Mrs. Kruskal die prior to the above date her daughter will receive whatever is still due up to July 10, 1954, in a lump sum.

As stated in defendant's memorandum:

"In the year 1942, the former wife received $8,000 alimony from her former husband and in addition, he paid life insurance premiums in the sum of $911.90. In the year 1943, the former wife received $8,000 alimony and, in addition, her former husband paid $1,310.90 life insurance premiums.

"The decedent reported upon his Income Tax Returns that the amount paid to his former wife as alimony included the said premiums upon the said life insurance policies and the Internal Revenue Bureau determined that the said premiums upon the life insurance policies were in-cludible as income to the former wife as alimony paid, pursuant to the decree and judgment of absolute divorce."

*The Government contends* that the policies were part of the decedent's estate because he paid all the premiums thereon during his lifetime, Clause (A) of Sec. 811(g) (2) of the Internal Revenue Code, and because he possessed at death an incident of ownership, Clause (B). of Sec. 811(g) (2) of Internal Revenue Code.[2] In addition the Government contends that the policies are includible in the decedent's estate as a transfer intended to take effect in possession or enjoyment at his death and as a transfer in contemplation of death, § 811(c).[3]

2, 3.

"§ 811. Gross Estate [As amended by sec. 7 of Public Law 378, 81st Cong., known as the 'Technical Changes Act of 1949' and made applicable to the estates of decedents dying after February 10, 1939.]

\* \* \* \* \*

"(c) Transfers in Contemplation of, or Taking Effect at, Death.—

"(1) General rule.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise—

"(A) in contemplation of his death. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this sub-chapter; or

"(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (i) the possession or enjoyment of, or the right to the income from, the property, or (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; or

"(C) intended to take effect in possession or enjoyment at or after his death.

"(2) Transfers taking effect at death—Transfers prior to October 8, 1949.—An interest in property which the decedent made a transfer, on or before October 7, 1949, intended to take effect in possession or enjoyment at or after his death shall not be included in his gross estate under paragraph (1) (C) of this subsection unless the decedent has retained a reversionary interest in the property, arising by the express terms of the instrument of transfer and not by operation of law, and the value of such reversionary interest immediately before the death of the decedent exceeds 5 per centum of the value of such property. For the purposes of this paragraph, the term 'reversionary interest' includes a possibility that property transferred by the decedent (A) may return to him or his estate, or (B) may be subject to a power of disposition by him, but such term does not include a possibility that the income alone from such property may return to him or become subject to a power of disposition by him. \* \* \*

"(g) Proceeds of life insurance

\* \* \* \* \*

"(2) Receivable by other beneficiaries.

"To the extent of the amount receivable by all other beneficiaries as insurance under policies upon the life of the decedent (A) purchased with premiums, or other consideration, paid directly or indirectly by the decedent, in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance, or (B) with respect to which the decedent possessed at his death any of the incidents of ownership, ex-

The Government further contends that the claim of Helen Hall to the proceeds of the life insurance policies is based on the separation agreement and that said agreement was not for an adequate consideration under the statute because the provisions it made for Helen Hall, including the life insurance policies, were based on her surrender of marital rights, which the statute states is not an adequate consideration.[4]

*The plaintiff executor contends* that the issue in this case "is whether the incorporation of the separation agreement into the divorce decree resulted in the claim (Helen Hall's claim) being founded on an obligation imposed by law" that the policies "became the property of decedent's first wife (Helen Hall) upon the making and entering of the divorce decree"; that the obligation of the estate to recognize Helen Hall's interest in the policies is "an obligation imposed by law through the decree of divorce and consequently Sections 811 (c) and 811 (g) are entirely inapplicable". Plaintiff asserts Helen Hall's claim to the policies is deductible in determining the decedent's net estate under Section 812 (b) (3) as a claim against the estate based upon a judgment of a court—the decree of divorce issued by the Nevada court.

The principles of law, as established by the United States Supreme Court in a similar case, Harris v. Commissioner of Internal Revenue, 340 U.S. 106, 71 S.Ct. 181, 183, 95 L.Ed. 111, control the decision of this action. The important difference between this case and the Harris case is this. In the Harris agreement it was provided that the settlement "shall not become operative in any manner nor shall any of the Recitals or covenants herein become binding upon either party unless a decree of absolute divorce between the parties shall be entered in the pending Nevada action." In the case at bar there is no such provision.

The majority opinion in the Harris case, written by Mr. Justice Douglas, stated that under the provisions of the Harris agreement "without the (divorce) decree there would be no enforceable, existing agreement whether the settlement was litigated or unlitigated", and that "in each case it is the decree that creates the rights and the duties; and a decree is not a 'promise or agreement' in any sense—popular or statutory." He further stated:—"It is 'the transfer' of the property with which the gift tax statute (in the Harris case) is concerned, not the sanctions which the law supplies to enforce transfers. If 'the transfer' of marital rights in property is effected by the parties, it is pursuant to a 'promise or agreement' in the meaning of the statute. If 'the transfer' is effected by court decree, no 'promise or agreement' of the parties is the operative fact."[5]

---

ercisable either alone or in conjunction with any other person. For the purposes of clause (A) of this paragraph, if the decedent transferred, by assignment or otherwise, a policy of insurance, the amount paid directly or indirectly by the decedent shall be reduced by an amount which bears the same ratio to the amount paid directly or indirectly by the decedent as the consideration in money or money's worth received by the decedent for the transfer bears to the value of the policy at the time of the transfer. For the purposes of clause (B) of this paragraph, the term 'incident of ownership' does not include a reversionary interest." This last sentence was, in effect, amended September 23, 1950, as hereinabove set forth in footnote 1a.

4. See § 812(b) (5) of T. 26 U.S.C.A.

which is hereinafter discussed in footnote 5.

5. In the Harris case although the tax on gifts "direct or indirect" was involved, the court referred to the Estate Tax statute, Sec. 812 of 26 U.S.C.(1946 Ed.), which provided that deductions for claims against the estate founded upon a promise or agreement shall be limited to the extent they were contracted for "an adequate and full consideration in money or money's worth". The said section further provides that "For the purposes of this subchapter, a relinquishment or promised relinquishment of dower, curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration 'in money or money's worth.'"

This interpretation of the Harris decision is in agreement with the views expressed by the Court of Appeals of this Circuit in Rosenthal v. Commissioner of Internal Revenue, 205 F.2d 505, 508, decided June 24, 1953, that the Harris case "held a settlement of marital property rights between husband and wife, operative by its terms only on entry of a divorce decree, to be exempt from gift taxes", and that the basis for the Supreme Court's decision "was the Court's holding that the settlement was founded not on a voluntary promise or agreement, but on the command of the divorce court, instructed by state law to decree a just and equitable disposition of the parties' property" and that "hence the arrangement was deemed in effect to be for 'an adequate and full consideration in money or money's worth,'" citing 26 U.S.C. § 1002 and Commissioner of Internal Revenue v. Converse, 2 Cir., 163 F.2d 131.

In an action instituted by Eugene Kruskal against his wife, Helen Hall Kruskal, in a Nevada court, a decree of divorce was entered on April 6, 1940. The plaintiff was granted a divorce on the ground of extreme cruelty; the parties were restored to the status of single persons; and the wife was permitted to resume her maiden name. The decree also provided "that the written agreement, dated the 26th day of September, 1939, settling all property rights between Plaintiff and Defendant, and providing for the support and maintenance of the Defendant by the Plaintiff, is hereby approved, adopted and confirmed by this Court, and the parties hereto are directed to comply with the terms thereof".

■ In the case at bar the separation agreement became enforceable when it was signed by the parties. The agreement created the rights of the respective parties. It did not require a court decree in any matrimonial action to give effect to the agreement. The agreement was effective both before and after the court decree. At best the Nevada court decree afforded an additional sanction. The decree was not the sole sanction.

At the time the agreement was signed, Mrs. Kruskal had a suit pending in a Connecticut state court seeking a decree of divorce. The agreement in paragraph Fourteenth stated that nothing in the agreement was to be construed as hindering either party in seeking a decree in a matrimonial action and that in the event of a final judgment or decree, it should contain no other provisions for alimony, maintenance and support than those provided by the separation agreement; and said paragraph further stated that "Mrs. Kruskal does hereby renounce and waive any right that she may have except under the terms of this agreement".

■ The endorsement of the insurance policies made pursuant to the separation agreement was not a transfer "in contemplation of death", under Sec. 811(c). Cowles v. United States, 2 Cir., 152 F.2d 212, 214. The transfer "was indeed done 'in contemplation of death,' but that motive was subsidiary, one which was as far as can be imagined from being 'dominate,' as it must be to bring the transaction within § 811(c)." The logic of that case has never been challenged. But the transaction in relation to the insurance policies may be construed as "intended to take effect in * * * enjoyment at or after his death" (see the Cowles case). Possession of the proceeds of the policy could be obtained by Helen Hall only by surviving the decedent. Reg. 105, Sec. 81.17.

■ The decedent retained a reversionary interest in the policies which, as to each policy exceeded immediately before decedent's death 5% of the value of the policy. The cash surrender value, not the face value is used. Under the provisions of the policies and the endorsements which decedent had the companies put upon the policies to give effect to the provisions of the separation agreement, there was a possibility that the policies transferred by the decedent might return to him or his estate if his first wife, Helen Hall, and his daughter, Elizabeth Kruskal Allen, both predeceased decedent, Eugene Kruskal, as

hereinabove shown. Commissioner of Internal Revenue v. Washer, 6 Cir., 127 F.2d 446 and Goldstone v. United States, 2 Cir., 144 F.2d 373.

The decedent paid all the premiums on all seven policies. On all but one of the policies the premiums had been paid in full prior to the date of the separation agreement. On the New York Life policy decedent paid all the premiums prior to the date of the separation agreement and thereafter; but in the years 1942 and 1943 the decedent reported upon his income tax returns that the amount paid to his former wife, Helen Hall, as alimony included the premiums upon said policies and the premiums thus reported and paid were taxed as income to her under the decree of divorce.

■■ As to the policies on which the premiums were all paid by decedent and not charged as alimony to Helen Hall, it appears that under Sec. 811(g) (2) (A) the amounts receivable by the beneficiaries are considered as part of decedent's estate for estate tax purposes. As to the New York Life policy on which the premiums were charged to Helen Hall as alimony in the years 1942 and 1943, she did not in fact pay those premiums. All she did was to pay the tax the Government required her to pay on the alimony she received, including the life insurance premiums. All doubt is removed by the stipulation of facts herein which states that Eugene Kruskal paid all the premiums on all the policies.

■ The proceeds of the policies would be taxable as part of Eugene Kruskal's estate under Clause (B) of Sec. 811(g) (2), as property "with respect to which the decedent possessed at his death * * * incidents of ownership, exercisable either alone or in conjunction with any other person." The decedent, with the consent of Helen Hall, could have changed the primary beneficiary on all seven policies; and if he survived Helen Hall, the decedent might have changed the beneficiary of two of

the policies with the consent of his daughter Elizabeth. As to five of the policies, two issued by Massachusetts Mutual Life Insurance Company and three issued by Northwestern Mutual Life Insurance Company, the insured did not waive his right to change the contingent beneficiary and her consent to a change was not necessary.

The decedent's " 'incident of ownership' comprised a reversionary interest which (1) at some time after January 10, 1941, had a value which exceeded 5 per centum of the value of the policy, and (2) the reversionary interest arose by 'the express terms of the policy or other instrument and not by operation of law' ". The provisions of the endorsements on the policies on the life of Eugene Kruskal, made in the fall of 1940, created the possibility that the control of the policies would return to the decedent for further disposition [See footnote 1a above]. Hence under Sec. 811(g) (2) (B), as in effect amended September 23, 1950, the decedent, Eugene Kruskal, immediately prior to his death possessed an incident of ownership in respect to the policies which made them part of the principal of his estate for estate tax purposes.

Sec. 811(g) (3) relating to transfers of policies "not a gift", has no application to the case at bar. That subdivision refers to a situation where there is a transfer of a policy to creditors, in which no element of donative intent is involved. See H. Report No. 2333, 77th Cong. 2nd Sess. p. 162 and Senate Report No. 1631, 77th Cong. 2nd Sess. p. 235.

The above discussion disposes of the various contentions of the respective parties to this suit. For the reasons hereinabove stated I have concluded that the proceeds of the seven life insurance policies were properly taxed as part of the estate of the decedent, Eugene Kruskal, and that the complaint should be dismissed on the merits, with costs to the defendant.

Let judgment be entered accordingly.